**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

MICAELLA ONA,
individually and on behalf of all those
similarly situated,

Plaintiff,

CASE NO.: 1:26-cv-22392-CMA

vs.

INSOMNIAC HOLDINGS, LLC,

Defendant.
_______________________________________/

**DEFENDANT'S VERIFIED MOTION TO STAY**
**AND COMPEL ARBITRATION OR, IN THE ALTERNATIVE,**
**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Defendant, Insomniac Holdings, LLC ("Defendant" or "Insomniac"), by and through the undersigned counsel, and, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), respectfully requests that the Court enter an order staying this action in favor of arbitration, or, alternatively, dismissing the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and, in support thereof, states the following.

## INTRODUCTION

Insomniac is a company that hosts dance music festivals and events. Plaintiff has purchased tickets to dozens of those events in the last three years and remains on layaway plans for two additional events in 2026. Each time Plaintiff purchased a ticket, she agreed to binding arbitration and waived her right to pursue collective or class action claims. Still, Plaintiff filed this class action lawsuit alleging that Insomniac sent a text message nineteen minutes after statutory "quiet hours."

Undisputed records show that Plaintiff repeatedly purchased tickets to Insomniac events through two online ticketing sites: DICE and Front Gate. These events include, without limitation, Hocus Pocus 2025—the same event depicted in the screenshot embedded in the Complaint. Each purchase required Plaintiff to proceed through online sales flows that disclosed and incorporated binding terms, including Insomniac's Terms of Use, DICE's Ticket Purchase Terms, Front Gate's Terms of Use, and/or Front Gate's Terms of Sale. Those agreements all contain broad arbitration

provisions and class-action waivers. Under the Federal Arbitration Act, Florida contract law, and this Court's decisions enforcing arbitration agreements, those agreements must be enforced.

Arbitration aside, the Complaint fails before it begins. Section 227(c)(5), Plaintiff's chosen cause of action, authorizes suit only by a person who received "more than one *telephone call*" within a 12-month period. 47 U.S.C. § 227(c)(5) (emphasis added). Plaintiff does not allege that Insomniac placed a telephone call to her cellular phone. Instead, she alleges that Insomniac sent her only two marketing text messages, both allegedly sent at 9:19 p.m., and she defines her proposed class entirely by receipt of "marketing text message[s]." Compl. ¶¶ 17–18, 27, 43. Congress used the words "message" and "text message" elsewhere in the TCPA. It did not use them in § 227(c)(5). That omission is dispositive here.

This Court acknowledges that courts should not rewrite statutes and has specifically refused to expand statutory remedies beyond the text Congress or the relevant legislative body enacted. The same textual discipline controls here. After *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 606 U.S. 146, 150–53 (2025), district courts must interpret the TCPA under ordinary principles of statutory interpretation, not reflexively defer to an FCC interpretation that expands the statutory cause of action. And the Eleventh Circuit has made clear that the FCC's authority to "implement" the TCPA does not permit it to override Congress's chosen words: "atextual good policy cannot overcome clear text." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 309–10 (11th Cir. 2025).

Courts in this Circuit have recently applied those principles to reject the exact theory Plaintiff pleads, holding that § 227(c)(5)'s private right of action reaches repeated "telephone calls," not text messages. Therefore, at best, Plaintiff must arbitrate individually because she accepted arbitration and class-waiver terms when buying tickets to Insomniac-affiliated events. At bottom, her text-message-only Complaint does not state a claim under 47 U.S.C. § 227(c)(5), and her claim must be dismissed.

## FACTUAL BACKGROUND

1. Plaintiff purchased tickets for the following events, which took place at a venue managed and operated by Defendant known as "Factory Town": (1) Martin Garrix / Miss Monique / SLUGG - Race Weekend, May 3, 2026; (2) III Joints, April 18, 2026; (3) Factory Town Music Week 2026 (5-Day Pass, March 25, 2026; (4) Disco Lines, January 17, 2026; (5) Factory Basel 2025 (Week Pass) December 3, 2025; (6) Hocus Pocus 2025 (3-Day Pass), October 31, 2025; (7)

Cloonee's HellBent/Deep House Bible/PIV Records Showcase, March 26, 2025; (8) Mayan Warrior Galaxyer Fundraiser (The Park Stage) + Seth Troxler B2B Victor Calderone (Chain Room) (Factory Basel Opening 2024), December 5, 2024; (9) Hocus Pocus 2024, October 31, 2024; (10) III Joints 2024, April 20, 2024; (11) Elrow Miami Music Week: RowsAttacks! 2024+PIV, March 24, 2024; (12) ARTCORE / ELI BROWN / MADAFAKAZ - SATURDAY MMW, March 23, 2024; (13) ZHU, Hayden James & Miss Monique (NYE Weekend), December 29, 2023; (14) Factory Town Basel Pass 2023, December 7, 2023; (15) III JOINTS 2023, April 20, 2023; (16) Elrow: Miami Music Week Edition 2023, March 23, 2023; (17) AFTERLIFE MIAMI 2022, December 2, 2022; (18) Hocus Pocus (DAY 3) October 30, 2022. *See* Declaration of Ian Humphrey, a true and correct copy of which is attached as **Exhibit A**, at ¶ 12.

2. Plaintiff purchased these tickets through a website known as "Dice," which can be found at www.dice.fm. *Id.*




3. Each time Plaintiff selected an event, she was taken to a landing page containing Insomniac's terms highlighted in yellow. Humphrey Decl. ¶¶ 14-15.

4. As can be seen above, the page directs the user to Defendant's Terms of Use, which are highlighted in yellow. *Id.*

5. Defendant's Terms of Use Contain the following Arbitration Provision and Class Action Waiver:

**Disputes, Including Mandatory Arbitration and Class Action Waiver**

**YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY DISPUTE, CLAIM, OR CONTROVERSY RELATING IN ANY WAY TO THE TERMS, YOUR USE OF THE SITE, OR PRODUCTS OR SERVICES SOLD, DISTRIBUTED, ISSUED, OR SERVICED BY OR THROUGH US—IRRESPECTIVE OF WHEN THAT DISPUTE, CLAIM, OR CONTROVERSY AROSE—WILL BE RESOLVED SOLELY BY BINDING, INDIVIDUAL ARBITRATION AS SET FORTH IN THE TERMS, RATHER THAN IN COURT. YOU AND WE THEREBY EACH AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL, AND AGREE THAT YOU AND WE MAY BRING CLAIMS AGAINST EACH OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

A true and correct copy of the Insomniac Terms of Use is attached as **Exhibit B** and can also be found at https://www.insomniac.com/terms-of-use/.

6. That, however, is but the first disclosure of Defendant's Terms of Use.

7. In order to continue to purchase the desired tickets, Plaintiff had to, and did, click the "Buy Now" button on the screen. Humphrey Decl. ¶ 18.

8. Plaintiff was then taken to the checkout screen.




9. As seen in the photo, by purchasing tickets, Plaintiff received an account and agreed to the Dice.fm "Ticket Purchase Terms." A true and correct copy of the Dice Ticket Purchase Terms is attached as **Exhibit C** and can be found at https://dicefm.zendesk.com/hc/en-gb/articles/4412965076881-United-States-Purchase-Terms.

10. The Dice Ticket Purchase Terms state, in pertinent part, "We are a disclosed ticketing agent selling tickets via our App on behalf of promoters, organizers, managers, artists and venues of music, entertainment, sports and similar events (our "Event Partners")." Dice Ticket Purchase Terms § 1.2

11. The Dice Ticket Purchase Terms then go on to reiterate:

2.1 Any ticket purchased or otherwise acquired ("Purchased") through the App or on the Service is subject to:

- These Purchase Terms;
- Our Terms of Use;
- Our Privacy Policy;
- The Event Terms and Conditions, if applicable; and
- Any additional terms and conditions of the relevant Event Partner(s) which can be found on their respective websites or at the venue itself or which are disclosed during the ticket purchase process.

Dice Ticket Purchase Terms § 2.1 (yellow highlighting added).

12. As noted in the fifth bulleted paragraph, Dice.fm specifically incorporates Defendant's—an Event Partner—Terms of Use. Humphrey Decl. ¶ 23.

13. If that were not enough, after agreeing to "check out," Plaintiff was then prompted to pay for her tickets. Prior to paying, however, Plaintiff was required to once again acknowledge the Dice Ticket Purchase Terms, which incorporate the Plaintiff's Terms of Use. Humphrey Decl. ¶ 24 (red shape added).




14. This process was the same for each and every one of Plaintiff's purchases through Dice. Humphrey Decl. ¶ 27.

15. But still, there is more. Plaintiff also purchased tickets for a number of other Insomniac events through the online ticketing platform, "Front Gate."

16. Defendant is an affiliate of Front Gate Ticketing Solutions, LLC ("Front Gate").[1]

17. Indeed, both entities have a common controlling parent entity: Live Nation Entertainment, Inc (Humphrey Decl. ¶ 31), and both entities collaborate to facilitate ticket sales for Insomniac and Live Nation. *See* Front Gate Declaration, a true and correct copy of which is attached as **Exhibit D**, at ¶¶ 8-9; *see also* Exhibit 21.1 to Live Nation's SEC Form 10-K for fiscal year ending December 31, 2025, a true and correct copy of which is attached hereto as **Exhibit E** (showing Insomniac and Front Gate as subsidiaries of Live Nation).

18. Plaintiff purchased tickets to the following events from Frontgatetickets.com: (1) RLMIA, Saturday GA; (2) III Points, 2-Day GA; (3) EDC Orlando 2024, 3-DAY VIP; (4) III Points 2024, 2-Day GA; (5) III Points 2025, 2-Day GA; (6) EDC Orlando 2026, 3-Day VIP; (7) III Points MIA 2026, 2-Day GA. Humphrey Decl. ¶ 32.




19. Prior to purchasing tickets from Front Gate, Plaintiff was required to log in or create an account.

20. As seen in the added red circle in the image to the right, prior to logging in or creating an account, Plaintiff was required to agree to Front Gate's Terms of Use by clicking, *i.e.*, checking, the box. Humphrey Decl. ¶¶ 33-34.

21. Without exception, each and every purchase thereafter was subject to the terms and conditions Plaintiff agreed to. *Id.*

22. Front Gate's Terms of Use, a true and correct copy of which is attached **as Exhibit F** and which can be found at frontgatetickets.com/legal/terms-of-use, state, in pertinent part:

---

[1] The ordinary corporate-law meaning of "affiliate" includes entities related through common ownership or control. *See Churchville v. GACS Inc*., 973 So. 2d 1212, 1215 (Fla. 1st DCA 2008) (defining "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation" (quoting Black's Law Dictionary 59 (7th ed. 1999))); *id.* at 1217 (Van Nortwick, J., concurring) (explaining that the definition of "affiliate" is "generally accepted in the corporate law context" and citing Florida's statutory definition of "affiliate" as an entity that controls, is controlled by, or is under common control with another); *see also* Affiliate, Black's Law Dictionary (11th ed. 2019) (defining "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation"); Fla. Stat. § 607.0901(1)(a) ("Affiliate" means a person who directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, a specified person.).

# Terms of Use

Last updated: November 10, 2025

These Terms of Use ("Terms") govern your use of Front Gate Ticket's websites and applications—including (without limitation) frontgatetickets.com—and your purchase, possession, sale, acceptance, or use of any of our tickets or passes (collectively, "Ticket" or "Tickets"), products, or services (our "Marketplace," defined in Section 1, below).

Our other policies—including our Terms of Sale and Privacy Policy (collectively "Other Policies"), as applicable—are also incorporated into these Terms.

**NOTICE REGARDING ARBITRATION AND CLASS ACTION WAIVER:** The Terms contain an arbitration agreement and class action waiver—along with some limited exceptions—in Section 14, below. Specifically, you and we agree that any dispute or claim relating in any way to the Terms, your use of the Marketplace, or products or services sold, distributed, issued, or serviced by us or through us, will be resolved by binding arbitration, rather than in court.

This updated arbitration agreement and class action waiver applies to all such disputes or claims between us, except those already filed and currently pending as of November 10, 2025. For all such matters pending as of November 10, 2025, this updated agreement and waiver will not alter the rights and obligations that currently exist in those matters, such that those matters may or may not be subject to arbitration, and if the former, will remain governed by any applicable arbitration agreement or agreements that currently exist between the parties in those matters.

By agreeing to arbitration, you and we each waive any right to participate in a class action lawsuit or class action arbitration, except those already filed and currently pending as of November 10, 2025.

**NOTICE REGARDING FUTURE CHANGES TO TERMS:** From time to time, we may update these Terms and our Other Policies, as detailed in Section 11, below. Any changes we make will only be binding on you if and when you agree to the updated Terms. The Effective Date above will tell you when the Terms were last revised, and the Download Prior Version link will take you to the last version of the Terms.

To the extent that these Terms have been updated from a prior version of the Terms to which you previously agreed, the most recent version of the Terms to which you agreed supersedes and governs.

On this page

1. This is a Contract Between You and Us
2. Other Policies
3. Accounts
4. Our Content
5. User Content
6. Our Marketplace Code of Conduct
7. Termination
8. Disclaimer of Warranties and Release
9. Limitation of Liability
10. Indemnification
11. General
12. Severability
13. Mobile Messaging
14. Disputes and Arbitration
15. Copyright Complaints
16. Additional Terms If You Use Any of Our Apps from the Apple App Store
17. Questions

(red shape added).

# 1. This is a Contract Between You and Us

These Terms are a legally binding agreement between you, the user ("you" or "your"), and us. We use the terms "us," "we," and "our" to refer to Front Gate Ticketing Solutions, LLC ("Front Gate"), and all of Front Gate's parents, subsidiaries, and affiliates.

You and we are each a "party" and collectively we are the "parties" to the contract.

"Marketplace" refers to our websites and mobile applications—including (without limitation) frontgatetickets.com—and to our Tickets, products, and services.

(red shape added).

## 14. Disputes and Arbitration

**Please read this section carefully.**

**MANDATORY ARBITRATION AGREEMENT AND CLASS ACTION WAIVER.** THE PARTIES AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY DISPUTE, CLAIM, OR CONTROVERSY RELATING IN ANY WAY TO THE TERMS OR YOUR USE OF THE MARKETPLACE, WHICH INCLUDES ALL PRODUCTS OR SERVICES SOLD, DISTRIBUTED, ISSUED, OR SERVICED BY OR THROUGH US—IRRESPECTIVE OF WHEN THAT DISPUTE, CLAIM, OR CONTROVERSY AROSE—WILL BE RESOLVED SOLELY BY BINDING, ARBITRATION AS SET FORTH IN THE TERMS, RATHER THAN IN COURT. BY AGREEING TO ARBITRATION, THE PARTIES AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL AND AGREE THAT YOU AND WE MAY BRING CLAIMS AGAINST EACH OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS PROCEEDING.

23. Without exception, every individual or entity that makes a purchase on the Front Gate Website—including Plaintiff—agrees to the Terms of Use. Humphrey Decl. ¶¶ 33-34.

24. Before a prospective purchaser is permitted to finalize a ticket purchase, he or she is prompted to "Review and Confirm" their Order. Humphrey Decl. ¶¶ 42-43.

25. Upon reaching the "Review and Confirm" screen, the Front Gate Website advised Plaintiff that she needed to Agree to the Terms of Use and the Terms of Sale. Indeed, Plaintiff was *again* prompted to check a box, which clearly and conspicuously stated:


4 Review & Confirm

Please review order details above. Clicking "Purchase Tickets" will finalize your purchase and your credit card will be charged at this time.

Email address for your receipt *

gmorales@shawlewenz.com

☐ Official III Points Email List

Yes, I would like to receive the latest updates from III Points (privacy policy).

Agree To Terms Of Sale

☐ I have read and agree to Front Gate's current **Terms of Use** and **Terms of Sale**, last updated November 2025, including the arbitration agreement and class action waiver. I understand that tickets are NON-REFUNDABLE and NON-EXCHANGABLE. Festival performers and band members may change or cancel without notice. Ticket prices may also increase or decrease at any time. No refunds, credits, or price adjustments will be given for any such changes or cancelations

☐ I have read and agree to the Front Gate **Privacy Policy**, and consent to the handling of my personal information for the purposes described in it.

Purchase Tickets

Humphrey Decl. ¶¶ 42-44 (red shape and yellow highlighting added).

26. The underlined terms above were hyperlinked to the respective agreements. Humphrey Decl. ¶ 43.

27. It was impossible for Plaintiff to purchase her tickets without first clicking the box to agree to the Terms of Use and Terms of Sale. Humphrey Decl. ¶¶ 45-46.

28. If she had tried, she would be kept on the same Review & Confirm screen, and the text would turn red:



4 Review & Confirm

Please review order details above. Clicking "Purchase Tickets" will finalize your purchase and your credit card will be charged at this time.

Email address for your receipt *

gmorales@shawlewenz.com

☐ Official III Points Email List

Yes, I would like to receive the latest updates from III Points (privacy policy).

Agree To Terms Of Sale

☐ I have read and agree to Front Gate's current Terms of Use and Terms of Sale, last updated November 2025, including the arbitration agreement and class action waiver. I understand that tickets are NON-REFUNDABLE and NON-EXCHANGABLE. Festival performers and band members may change or cancel without notice. Ticket prices may also increase or decrease at any time. No refunds, credits, or price adjustments will be given for any such changes or cancelations

☐ I have read and agree to the Front Gate Privacy Policy, and consent to the handling of my personal information for the purposes described in it.

Purchase Tickets

Humphrey Decl. ¶¶ 45-46.

29. If Plaintiff clicked the link to the Terms of Sale, a large text box would pop up, conspicuously displaying the Terms of Sale. A true and correct copy of the Terms of Sale is attached hereto as **Exhibit G** and can be found at https://www.frontgatetickets.com/legal/terms-of-sale.

30. Here, as evidenced by the fact that she purchased the tickets, Plaintiff checked the box, agreed to Front Gate's Terms of Use and Terms of Sale, and purchased the tickets. Humphrey Decl. ¶ 54.

31. As seen in Exhibit G, the Terms of Sale again directed Plaintiff to the Arbitration Agreement and Class Action Waiver:



# Terms of Sale

Last updated: November 10, 2025

This Terms of Sale ("Terms of Sale"), along with our Terms of Use ("Terms"), applies to all ticket or pass (collectively, "Ticket" or "Tickets") purchases and purchases of associated products and services on our websites and applications and to your use of our Tickets, products, and services (our "Marketplace," defined in Section 1, below).

When you purchase Tickets and associated products and services through our Marketplace, you agree to be bound by this Terms of Sale and the Terms, as they are updated from time to time. You also agree to comply with any terms and conditions set by the people who put on the events—such as artists, venues, and promoters (the "Event Organizer"). In addition, if you choose to purchase an extra service or product (e.g.,insurance or parking) from a third party, you agree to any additional third-party terms presented in the checkout flow. If you don't agree, don't purchase Tickets or associated products or services through or use the Marketplace.

**Please note that Section 14 of the Terms contains an arbitration agreement and class action waiver.** In that section, you and we mutually agree that any dispute or claim will be resolved through binding arbitration—and not in court or through aclass action lawsuit or class-wide arbitration.

## 1. Parties

This Terms of Sale, together with our Terms, is a legally binding agreement between you, the user ("you" or "your"), and us. We use the terms "us," "we," and "our" to refer to Front Gate Ticketing Solutions, LLC ("Front Gate"), and all of Front Gate's parents, subsidiaries, and affiliates.

If you are making a purchase on behalf of a company or other legal entity, you represent and warrant that you have the authority to bind that company or other legal entity to the terms of this Terms of Sale (and that references to "you" and "your" also refer and apply to that company or other legal entity).

You and we are each a "party" and collectively we are the "parties" to the contract.

"Marketplace" refers to our websites and mobile applications—including (without limitation) frontgatetickets.com—and to our Tickets, products, and services.

On this page

1. Parties
2. Who We Are—and Who You Are Buying From
3. Ticket Availability
4. Pricing
5. Ticket Restrictions
6. Purchasing Tickets
7. Order Confirmation
8. Ticket Delivery
9. Delivery of Non-Ticket Purchases
10. Errors
11. Opening Acts, Understudies, and Multi-Performer Events
12. Seating
13. Ticket Transfer
14. Canceled, Postponed, Rescheduled, or Moved Events
15. Refunds
16. No Refunds, Credits, or Exchanges for Certain Purchases
17. Promotions
18. Assumption of Risk
19. Protect Your Tickets
20. Resale of Tickets
21. Attending Events
22. General
23. Questions

(red shape added).

32. As such, Plaintiff unequivocally and irrevocably consented to the Arbitration Agreement and Class Action Waiver contained in Front Gate's Terms of Use and Terms of Sale, thereby waiving her right to pursue this action in this Court and waiving her right to pursue this action as a collective or class action as she attempts to do here. Plaintiff waived her right to pursue this action as a collective or class action and outside of an arbitral forum through no less than three agreements. Thus, this action must be stayed in favor of arbitration.

## LEGAL STANDARD

### I. Motion to Compel Arbitration

Both the Insomniac and Front Gate Terms of Use specifically invoke the Federal Arbitration Act:

> "The arbitration agreement in the Terms is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) ("FAA"), including its procedural provisions, in all respects. This means that the FAA governs, among other things, the interpretation and enforcement of this arbitration agreement and all of its provisions, including, without limitation, the class action waiver."

Ex. B; Ex. F.

The Federal Arbitration Act ("FAA") provides that a written arbitration agreement in a contract involving commerce "shall be valid, irrevocable, and enforceable" unless a generally applicable contract defense applies. 9 U.S.C. § 2. The FAA reflects "a liberal federal policy favoring arbitration agreements," but "state law generally governs whether an enforceable contract or agreement to arbitrate exists." *Tejon v. Zeus Networks, LLC*, No. 24-11114, 2026 WL 1194722, at *2 (11th Cir. May 1, 2026) (citation omitted); *see also Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329–30 (11th Cir. 2016).

The Court applies a summary-judgment-like standard to determine whether the parties entered into a valid arbitration agreement. *See Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1346–48 (11th Cir. 2025); *Bazemore*, 827 F.3d at 1333. If the making of the arbitration agreement is not genuinely disputed, the Court must enforce the agreement to arbitrate. *Valiente v. NexGen Glob., LLC*, No. 23-13308, 2025 WL 3140480, at *5–6 (11th Cir. Nov. 10, 2025). The Eleventh Circuit has held that "when a dispute is arbitrable, entry of a § 3 stay is mandatory." *Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1238 (11th Cir. 2008) (citing *Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004)); *see also* 9 U.S.C. § 3. Because Defendant requests a stay and is not in default in proceeding with arbitration, the Court should stay this action pending completion of arbitration.

This Court has repeatedly applied this framework. A party seeking to compel arbitration must show "(1) a valid written agreement to arbitrate exists; (2) an arbitrable issue exists; and (3) the right to arbitration was not waived." *Dimattina Holdings, LLC v. Steri-Clean, Inc.*, 195 F. Supp. 3d 1285, 1288 (S.D. Fla. 2016) (Altonaga, J.) (citation omitted) (granting motion to compel arbitration); *see also Sims v. Clarendon Nat'l Ins. Co.*, 336 F. Supp. 2d 1311, 1326 (S.D. Fla. 2004)

(Altonaga, J.) (same). Once the movant carries its initial burden, the party opposing arbitration has an "affirmative duty" to come forward with evidence showing why arbitration should not be compelled. *Sims*, 336 F. Supp. 2d at 1314; *Spurgeon v. Marriott Int'l, Inc.*, No. 16-24612-CIV, 2017 WL 896301, at *5 (S.D. Fla. Mar. 7, 2017) (Altonaga, J.).

Federal courts apply state law to determine whether there is a valid agreement to arbitrate. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Under Florida law, an enforceable internet contracts is created where the user receives reasonable notice of the terms and manifests assent. The Eleventh Circuit recently explained that Florida law recognizes both clickwrap and browsewrap agreements. *Tejon*, 2026 WL 1194722, at *2–3. A clickwrap agreement is formed when a user must check a box or click a button acknowledging agreement to terms. *Id.*; *Valiente*, 2025 WL 3140480, at *6. Clickwrap agreements are generally enforceable because the user takes an affirmative step manifesting assent. *Tejon*, 2026 WL 1194722, at *2–3; *see also MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018); *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484 (Fla. 5th DCA 2022); *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 764–65 (Fla. 4th DCA 2017).

If a valid arbitration agreement exists, doubts about the scope of arbitrable issues are resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *Klay v. All Defendants*, 389 F.3d 1191, 1200–01 (11th Cir. 2004). The FAA "leaves no place for the exercise of discretion" once the Court is satisfied that the parties agreed to arbitrate the dispute. *Klay*, 389 F.3d at 1200. Arbitration agreements may also be enforced by or against nonsignatories under ordinary state-law doctrines, including equitable estoppel and third-party-beneficiary principles. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *Spurgeon*, 2017 WL 896301, at *15–16.

Importantly, however, in the Eleventh Circuit, "[w]hen parties delegate threshold issues to the arbitrator, courts must honor that delegation.". *Lamonaco*, 141 F.4th at 1349–50; *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1295–98 (11th Cir. 2022). A delegation provision is severable and enforceable under the FAA, and absent a specific challenge to the delegation provision itself, the court must treat it as valid and send arbitrability disputes to the arbitrator. *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1144, 1148–49 (11th Cir. 2015).

Finally, class-action waivers in arbitration agreements are enforceable. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 352 (2011); *Cruz v. Cingular Wireless*, LLC, 648 F.3d

1205, 1212-13 (11th Cir. 2011) (holding that the FAA preempts any contrary state law purporting to invalidate class action waivers in arbitration).

**II. <u>Rule 12(b)(6)</u>**

A complaint must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the Court accepts well-pleaded factual allegations as true, it does not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

A Rule 12(b)(6) motion is also the proper vehicle to dismiss a claim where the statute relied upon does not create the private right or remedy the plaintiff seeks. *See Green v. Stericycle, Inc.*, No. 16-24206-CIV-ALTONAGA/O'Sullivan, 2016 WL 11776312 (S.D. Fla. Dec. 15, 2016) (Altonaga, J.) (dismissing claim where statute did not create the private enforcement remedy plaintiff asserted). The question whether a statute creates a private right of action and remedy is a matter of statutory interpretation. *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001); *Green*, 2016 WL 11776312.

Statutory interpretation begins with the text. If the text is clear, the inquiry ends there. *Young v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 818–19 (11th Cir. 2020). Courts must also presume that Congress uses different words to mean different things. *Sunshine State Reg'l Ctr., Inc. v. Director, USCIS*, 143 F.4th 1331, 1343–44 (11th Cir. 2025) ("Under the meaningful-variation canon, we presume that, when a statute uses one term in one place and a distinct term elsewhere, the difference matters—that is, the distinct words have different meanings"); *Fernandez v. Seaboard Marine, Ltd.*, 135 F.4th 939, 958 (11th Cir. 2025) (same).

That textual inquiry is especially important here. In *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, the Supreme Court held that district courts are not bound in TCPA enforcement actions by the FCC's interpretation of the TCPA; instead, courts must interpret the statute under ordinary principles of statutory interpretation, giving agency views only the respect they are due. 606 U.S. 146, 150–53 (2025). Consistent with *McLaughlin*, the Eleventh Circuit has held that the FCC's authority to "implement" the TCPA does not authorize the agency to change Congress's chosen statutory text, because "atextual good policy cannot overcome clear text." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 309–10 (11th Cir. 2025).

# ARGUMENT

## I. PLAINTIFF AGREED TO BINDING INDIVIDUAL ARBITRATION AND CANNOT MAINTAIN THIS CLASS ACTION IN COURT.

Plaintiff should be compelled to arbitrate this dispute individually because she repeatedly assented to binding arbitration and class-action waivers when purchasing tickets for Insomniac-related events. This is not a case involving hidden terms, passive website use, or a buried browsewrap provision. Defendant's evidence shows that Plaintiff affirmatively purchased tickets through online checkout flows that disclosed and incorporated governing terms, including arbitration and class-waiver provisions, and required Plaintiff to manifest assent before completing her purchases.

### a. Plaintiff accepted the Insomniac and DICE terms through an enforceable online contracting process.

Plaintiff repeatedly purchased tickets to events promoted, managed, or operated by Insomniac, including Hocus Pocus 2025—the very event depicted in the text-message screenshot attached to the Complaint. *See* Compl. ¶ 17; Humphrey Decl. ¶ 12. For each DICE purchase, Plaintiff selected the event, proceeded through the DICE purchase flow, and was directed to Insomniac's Terms of Use and DICE's Ticket Purchase Terms before completing the transaction. Humphrey Decl. ¶¶ 12-15.

Those terms are enforceable under Florida law. The Eleventh Circuit's recent decisions in *Tejon* and *Valiente* confirm that Florida law distinguishes between passive browsewrap terms and affirmative clickwrap-style assent. *Tejon*, 2026 WL 1194722, at *2–4; *Valiente*, 2025 WL 3140480, at *6. Where a purchaser is presented with terms and must take an affirmative step to continue the purchase, that assent is enforceable. *Tejon*, 2026 WL 1194722, at *2–3; *MetroPCS*, 273 So. 3d at 1028; *Massage Envy*, 339 So. 3d at 484; *Vitacost*, 210 So. 3d at 764–65.

This case is materially stronger for arbitration than the defective browsewrap or inadequate notice scenarios addressed in recent cases. In *Tejon*, the Eleventh Circuit refused to enforce an arbitration clause where the plaintiff was not required to click a box agreeing to terms and the website design did not reasonably notify her that she was agreeing to arbitration. 2026 WL 1194722, at *3–5. And in *Valiente*, the Eleventh Circuit found no assent where the relevant button merely authorized receipt of calls and texts and did not clearly communicate assent to separate contractual terms. 2025 WL 3140480, at *6–8. Here, by contrast, Plaintiff was not merely

browsing a website or clicking a button that only authorized communications. She was completing ticket purchases, the checkout process identified the governing terms, and she proceeded with the purchases after being presented with—and agreeing to—the applicable terms.

DICE's Ticket Purchase Terms also make clear that DICE acts as a ticketing agent for event partners, including promoters, organizers, managers, artists, and venues, and that tickets are subject to the event partner's terms. Plaintiff, therefore, accepted not only DICE's purchase terms, but also Insomniac's incorporated event terms, including Insomniac's arbitration agreement and class-action waiver. Under Florida law, incorporated terms are enforceable where the contract refers to the incorporated document and the party has an opportunity to review it. *See Management Comput. Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So. 2d 627, 631 (Fla. 1st DCA 1999); *BGT Grp., Inc. v. Tradewinds Engine Servs., LLC*, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011).

**b. Plaintiff separately accepted the Front Gate arbitration agreement and class waiver.**

Plaintiff also purchased Insomniac-related tickets through Front Gate. Humphrey Decl. ¶ 32. The Front Gate flow required Plaintiff to log in or create an account and affirmatively check a box agreeing to Front Gate's Terms of Use. Before completing a purchase, Plaintiff was again required to review and confirm her order, and the checkout page required her to check a box agreeing to the Terms of Use and Terms of Sale. Plaintiff could not complete the purchase unless she checked the required box.

That is a classic enforceable clickwrap agreement. *See Tejon*, 2026 WL 1194722, at *2–3; *Valiente*, 2025 WL 3140480, at *6; *MetroPCS*, 273 So. 3d at 1028. Plaintiff was presented with the terms, the terms were available through hyperlinks, and the purchase could not proceed without affirmative assent. Humphrey Decl. ¶¶ 33-47. Florida law does not permit an attendee to accept the benefit of admission to a ticketed event while disregarding the ticket's corresponding conditions, including arbitration. *See Miami Dolphins, Ltd. v. Engwiller*, 410 So. 3d 685, 691–92 (Fla. 3d DCA 2025) (reversing denial of motion to compel arbitration and explaining that allowing a patron to accept ticket benefits "without regard to corresponding conditions" would undermine arbitration policy and disrupt industries reliant on uniform ticket terms).

To the extent Plaintiff argues that Insomniac was not itself the contracting ticketing platform for every transaction, that argument fails. The Front Gate terms expressly extend to related entities, including affiliates, and Insomniac is an affiliate and event partner of Front Gate.

Humphrey Decl. ¶¶ 31; Ex. D. In any event, Florida law permits nonsignatories to enforce arbitration agreements under traditional doctrines such as equitable estoppel and third-party-beneficiary principles. *Arthur Andersen*, 556 U.S. at 631; *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170–71 (11th Cir. 2011). This Court applied those principles in *Spurgeon*, compelling arbitration where the claims against signatory and nonsignatory defendants were intertwined and the plaintiff's allegations treated the defendants' conduct collectively. 2017 WL 896301, at *15–16.

The same reasoning applies here. Plaintiff's claim arises from alleged marketing communications about Insomniac events and services—the same commercial relationship through which Plaintiff purchased tickets and agreed to arbitration. Plaintiff cannot rely on that relationship to sue Insomniac while disavowing the arbitration provisions governing the ticketing relationship. *See Spurgeon*, 2017 WL 896301, at *15–16.

**c. The issue of whether Plaintiff's claims against Insomniac are arbitrable is delegated to the arbitrator and therefore outside of this Court's jurisdiction.**

To the extent Plaintiff claims that her claims against Insomniac are not arbitrable or that Insomniac is somehow not protected by the arbitration provisions and class waivers, those arguments are to be evaluated by an arbitrator. This Court's analysis should be limited to whether there has been a proper delegation of arbitrability. There has.

Indeed, on the issue of arbitrability, the Insomniac Terms of Use and the Front Gate Terms of Use both state:

> **Delegation**; **Interpretation**. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable; however, in the event of a dispute about which particular version of this Agreement you agreed to, a court will decide that specific question. This arbitration agreement is intended to be broadly interpreted and will survive termination of the Terms.

Ex. B; Ex. F.

Both applicable arbitration provisions clearly and unequivocally delegate the issue of arbitrability to an arbitrator. Thus, any argument that Plaintiffs claims fall outside the arbitration provisions or that Insomniac is not protected thereby, are outside the purview of this Court. *Lamonaco*, 141 F.4th at 1349–50.

And, while both provisions leave open the issue of "version," it is indisputable that Plaintiff purchased tickets for EDC Orlando 2026 and III Points 2026 from Front Gate after November 2025, solidifying the applicability of the current terms and conditions. If the Court compels arbitration, a stay is mandatory under Section 3 of the FAA.

**d. Plaintiff's TCPA claim falls within the broad scope of the arbitration agreements.**

Even if arbitrability were before the Court (it is not), the arbitration provisions are broad and apply to disputes relating to the relevant terms, ticket purchases, websites, products, services, events, and related communications. Plaintiff's claim falls within that scope. The Complaint alleges that Insomniac sent Plaintiff marketing text messages promoting its property, goods, or services. Compl. ¶¶ 17–19. The screenshot attached to the Complaint depicts a message from Insomniac promoting an event called Hocus Pocus. Curiously, though she sues for the message, Plaintiff was seemingly pleased with the message and purchased a Hocus Pocus 2025 ticket through Dice. So, while it is evident from the breadth of the arbitration provisions that all disputes relating to Insomniac events or services are subject to arbitration, there can be no doubt this message falls squarely within the purview of arbitration. Humphrey Decl. ¶ 28.

Where, as here, the parties agreed to broad arbitration language, the Eleventh Circuit resolves doubts in favor of arbitration. *Klay*, 389 F.3d at 1200–01; *Moses H. Cone*, 460 U.S. at 24–25. The Court need not decide the ultimate merits of Plaintiff's TCPA theory to determine that the claim "relates to" the event, services, purchases, and communications governed by the arbitration agreements. *See Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218–19 (11th Cir. 2011).

**e. Plaintiff must arbitrate individually, and the class claims cannot proceed.**

Plaintiff filed this case as a putative class action, but she agreed to no less than two class-action waivers. Those waivers are enforceable under the FAA. *Concepcion*, 563 U.S. at 339, 352; *Lamps Plus*, 587 U.S. at 184–89. Plaintiff cannot avoid arbitration by styling her claim as a class action, and the Court cannot impose class arbitration absent an affirmative contractual basis for concluding that the parties agreed to class arbitration. *Lamps Plus*, 587 U.S. at 184–89.

Accordingly, the Court should compel Plaintiff to submit her claim to individual arbitration and stay this case pending arbitration. *See* 9 U.S.C. § 3; *Spizzirri*, 601 U.S. at 475–78.

## II. Alternatively, the Complaint Should Be Dismissed Because § 227(c)(5) Does Not Create a Private Right of Action for Text Messages

If the Court does not compel arbitration, it should dismiss the Complaint because Plaintiff sues under § 227(c)(5), which provides a private right of action for a person who receives "more than one telephone call" in a 12-month period—not texts. 47 U.S.C. § 227(c)(5).

### a. The Complaint pleads a text-only § 227(c)(5) claim.

Plaintiff merely alleges that Defendant transmitted "marketing text messages" before 8:00 a.m. or after 9:00 p.m. Compl. ¶ 2. The factual allegations identify two alleged messages, both at 9:19 p.m., and then allege that "Defendant sent Plaintiff two (2) marketing text messages" after 9:00 p.m. Compl. ¶¶ 17–18. The proposed class is defined entirely by receipt of "more than one marketing text message." Compl. ¶ 27. Count I likewise alleges that the "subject text messages" were telephone solicitations. Compl. ¶ 43.

Plaintiff therefore does not plead that she received "more than one telephone call," as required by § 227(c)(5). Instead, she asks the Court to rewrite the statute to include "text message." The law does not permit that result.

### b. Section 227(c)(5)'s plain text reaches telephone calls, not text messages.

Section 227(c)(5) provides a private right of action to a "person who has received more than one *telephone call* within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5) (emphasis added). Congress chose the term "telephone call." It did include the term "text message." And it did not incorporate every communication method that the FCC might later regulate.

That textual choice is dispositive. The TCPA uses different words in different places. For example, the statute defines "telephone solicitation" as "the initiation of a telephone call or message," 47 U.S.C. § 227(a)(4), and elsewhere expressly uses the term "text message," *see, e.g.*, 47 U.S.C. § 227(e)(8)(C). Congress thus knew how to refer to "messages" and "text messages" when it intended to do so. Its decision to create a private damages action in § 227(c)(5) only for repeated "telephone call[s]" must be given effect. *See Sunshine State*, 143 F.4th at 1343–44; *Fernandez*, 135 F.4th at 958.

This Court's decision in *Smith v. Under Armour* is instructive. There, the Court refused to stretch the statutory term "printed" to reach an online receipt, reasoning that the statute's text,

ordinary meaning, and context controlled. 593 F. Supp. 2d at 1287–88. The same approach controls here. A text message is not a telephone call in ordinary usage, and Congress's decision to use different words in different TCPA provisions forecloses Plaintiff's attempt to collapse those terms. Similarly, this Court's decision in *Green v. Stericycle* also supports dismissal. There, the Court declined to infer or expand a private enforcement remedy beyond the statutory scheme the legislature actually created. *Green*, 2016 WL 11776312 at *6-8. The same principle applies here: § 227(c)(5) supplies the private remedy, and that remedy extends only to persons who receive more than one "telephone call."

**c. The FCC's regulation cannot expand Congress' private right of action.**

Plaintiff will likely rely on 47 C.F.R. § 64.1200(c)(1) and § 64.1200(e), which address telephone solicitations and telemarketing calls to wireless numbers. But an agency regulation cannot expand the private right of action Congress enacted. After *McLaughlin*, district courts are not bound by the FCC's interpretation of the TCPA in private enforcement actions. 606 U.S. at 150–53. Courts must interpret the statute themselves under ordinary principles of statutory interpretation. *Id.* That rule is reinforced by *Insurance Marketing Coalition*, where the Eleventh Circuit held that the FCC's TCPA implementation authority does not permit the agency to alter Congress's chosen statutory text, because "atextual good policy cannot overcome clear text." 127 F.4th at 309–10.

Thus, even assuming the FCC has authority to regulate certain text-message practices, the relevant question here is different: did Congress create a private damages action for text messages under § 227(c)(5)? It did not. Section 227(c)(5) creates a private action only for repeated "telephone call[s]." 47 U.S.C. § 227(c)(5). The FCC cannot transform that private right of action into one for text messages. *See McLaughlin*, 606 U.S. at 150–53; *Ins. Mktg. Coal.*, 127 F.4th at 309–10.

**d. Post-*McLaughlin* TCPA decisions hold that text-only § 227(c)(5) claims fail.**

Recent district courts applying *McLaughlin* have rejected the exact theory Plaintiff asserts here. In *Radvansky v. 1-800-Flowers.com, Inc.*, the Northern District of Georgia dismissed a § 227(c)(5) claim based on text messages, holding that "telephone call" in § 227(c)(5) does not encompass text messages and that the plaintiff's claim failed as a matter of law. No. 1:25-CV-

2811-TWT, 2026 WL 456919, at *2–4 (N.D. Ga. Feb. 17, 2026). The court also held that the text-only class allegations failed for the same reason. *Id.*

The Middle District reached the same result in *El Sayed v. Naturopathica Holistic Health, Inc.*, holding that § 227(c)(5) does not authorize a private action for text messages because a text message is not a "telephone call" and because Congress used "text message" elsewhere in the TCPA but omitted it from § 227(c)(5). No. 8:25-cv-846-SDM-CPT, 2025 WL 2997759, at *2 (M.D. Fla. Oct. 24, 2025). The Northern District likewise held that a plaintiff asserting § 227(c)(5) "had to allege at least two telephone calls" and failed where he alleged only text messages. *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1272–74 (N.D. Fla. 2025).

The Southern District has recognized the same issue as a threshold legal question capable of resolving a text-only TCPA case at the pleadings stage. In *McGonigle v. Pure Green Franchise Corp.*, the court stayed discovery after taking a "preliminary peek" at a motion to dismiss raising this same argument, explaining that whether § 227(c)(5) creates a private right of action for text messages is a pure legal question to be resolved by statutory interpretation, not FCC deference. No. 25-61164-CIV, 2026 WL 111338, at *1–2 (S.D. Fla. Jan. 15, 2026).

Those cases are persuasive and apply directly here. Plaintiff alleges only text messages. Compl. ¶¶ 17–18, 27, 43. Under the plain text of § 227(c)(5), that is not enough.

**e. *Campbell-Ewald* and *Drazen* do not save Plaintiff's claim.**

Plaintiff's Complaint cites *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016), for the proposition that "a text message is a call." Compl. ¶ 14. That citation is misplaced. *Campbell-Ewald* involved § 227(b)(1)(A)(iii), which prohibits certain calls made using an automatic telephone dialing system or artificial/prerecorded voice. 577 U.S. at 156. It did not interpret § 227(c)(5), did not address the private right of action for do-not-call or quiet-hours regulations, and did not hold that the phrase "telephone call" in § 227(c)(5) includes text messages.

*Drazen v. Pinto*, 74 F.4th 1336 (11th Cir. 2023) (en banc), does not change the result. *Drazen* held that receipt of an unwanted text message can be a concrete injury for Article III standing purposes. *Id.* at 1342–47. Standing is not the issue here. Plaintiff may have suffered a concrete injury, but she still fails to state a claim. Congress did not create the private right of action she invokes. Here, § 227(c)(5) covers "telephone call[s]," not text messages. 47 U.S.C. § 227(c)(5).

## CONCLUSION

For the foregoing reasons, the Court should stay this action pending arbitration. Alternatively, if the Court declines to compel arbitration, the Court should dismiss the Complaint with prejudice because § 227(c)(5) does not create a private right of action for text messages.

## LOCAL RULE 7.1(a)(3)(A) CERTIFICATE OF CONFERRAL

I HEREBY CERTIFY that I conferred with counsel for the Plaintiff on May 17, 2026, via telephone in a good faith attempt to resolve the issue of arbitration raised herein. Plaintiff's counsel advised that, at this time, he objects to the relief sought.

Dated: May 20, 2026

Respectfully submitted,

SHAW LEWENZ
110 S.E. 6th Street, Suite 2900
Ft. Lauderdale, FL 33301
Telephone: (954) 361-3633
Facsimile: (954) 989-7781
Primary Email: jshaw@shawlewenz.com; zludens@shawlewenz.com; gmorales@shawlewenz.com
Secondary Email: avazuez@shawlewenz.com; lgrealy@shawlewenz.com

By: /s/*Gabriel E. Morales*
JORDAN A. SHAW, ESQ.
Fla. Bar No. 111771
ZACHARY D. LUDENS, ESQ.
Fla. Bar No. 111620
GABRIEL E. MORALES, ESQ.
Fla. Bar No. 1038778

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 20, 2026, a true copy of the foregoing was filed on CM/ECF.

*/s/Gabriel E. Morales*
Gabriel E. Morales